# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>DAVID ALMOG, | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>11-  **11  2164M** |

Complaint for violation of Title 18, United States Code § 371: Conspiracy to Defraud the United States

| NAME OF MAGISTRATE JUDGE<br>**HON. SUZANNE H. SEGAL** | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>On or before May 14, 2004 to at least April 17, 2006 | PLACE OF OFFENSE<br><br>Orange County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

   See attachment

FILED
CLERK, U.S. DISTRICT COURT

**SEP 1 6 2011**

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
   (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT  /S/<br><br>MIKE M. JEGALIAN |
|---|---|
| | OFFICIAL TITLE<br><br>Special Agent - IRS/CI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)  *Suzanne H. Segal* | DATE<br><br>September 16, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

Trial Attorney: Christopher S. Strauss (CDCA Contact: Dorothy C. Kim)      REC: Arrest Warrant

From on or before May 14, 2004 to at least April 17, 2006, in Orange County, within Central District of California, defendant DAVID ALMOG unlawfully and knowingly conspired with others to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department, by deceitful and dishonest means, in the ascertainment, computation, assessment, and collection of the revenue, and one or more of such persons committed any act to effect the object of the conspiracy, in violation of Title 18, United States Code, Section 371.

In furtherance of the conspiracy and to accomplish its objects, defendant ALMOG along with others committed the following overt act: On or about April 17, 2006, defendant ALMOG filed and caused to be filed with the IRS a false income tax return.

AFFIDAVIT

I, MIKE M. JEGALIAN, being duly sworn, depose and say:

1.      I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-
        CI").   I have been employed with IRS-CI as a Special Agent since approximately
        February 1996.  I am currently assigned to a group that investigates tax fraud, including,
        among other crimes, conspiracies to defraud the United States.  I have participated in
        investigations that focus on the use of undeclared foreign banks accounts by United States
        taxpayers and other individuals who willfully conceal assets and income from the IRS.

2.      The information contained in this affidavit is submitted for the sole purpose of
        demonstrating probable cause to obtain a criminal complaint and an arrest warrant
        charging DAVID ALMOG with violating Title 18, United States Code, Section 371,
        conspiracy to defraud the United States.  Because this affidavit is being submitted for the
        limited purpose of demonstrating probable cause, it does not contain all of the
        information known to me and /or other law enforcement officers involved in this case.

3.      The information in this affidavit is based on my personal knowledge, information
        provided to me by others, including other law enforcement officers and civilian
        witnesses, as well as my review of documents associated with the case.  I am aware of the
        facts and circumstances concerning this investigation and have participated in significant
        aspects of this investigation.  In particular, I have reviewed the following: wire transfer
        records of Wells Fargo Bank provided by Wells Fargo and copies of Wells Fargo bank
        records provided by former United Revenue Service, Inc. ("URS") Vice-President R.S.,

-1-

additional documents provided to the government by R.S., URS documents seized through the execution of a search warrant, the affidavit in support of the application for a search warrant, publicly available documents regarding URS, tax returns filed with the Internal Revenue Service ("IRS"), database records of the Department of Treasury, and memoranda of interview with URS employees.  I also was present at the interview of R.S. conducted on December 28, 2010.

<u>INTERNAL REVENUE SERVICE RULES AND REGULATIONS</u>

Based upon my training and experience I know the following:

4.      The IRS is an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States.

5.      United States citizens, resident aliens, and legal permanent residents of the United States are required to file an individual income tax return with the IRS reporting their worldwide income for each year if their gross income exceeds a certain amount.

6.      United States citizens, resident aliens, and legal permanent residents of the United States have an obligation to report to the IRS on the Schedule B of a U.S. Individual Tax Return, Form 1040, whether that individual has a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "YES" or "NO" in the appropriate box and identifying the country where the account is maintained.

7.      United States citizens, resident aliens, and legal permanent residents of the United States who have a financial interest in, or signature authority over, one or more financial

-2-

accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year are required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts on Form TD F 90-22.1 ("the FBAR"). The FBAR for the applicable year is due by June 30 of the following year.

8.    An "undeclared account" is a financial account maintained in a foreign country that has not been reported to the United States government on a tax return and FBAR.

## URS AND PARTIES

From interviews with URS employees, my review of an affidavit in support of a search warrant issued in connection with this case, URS corporate records provided by R.S., and a review of publicly available documents concerning URS, I know the following:

9.    URS is located in multiple locations throughout the United States. From on or before May 14, 2004 and continuing until at least April 17, 2006, URS had its headquarters in an office location in Newport Beach, California, located in the Central District of California. Beginning after mid-2006, URS's headquarters was relocated from Newport Beach, California to an office in Costa Mesa, California, located in the Central District of California. URS also had locations in Los Angeles, California; Santa Clara, California; San Diego, California; Seattle, Washington; Dallas, Texas; St. Louis, Missouri; Chicago, Illinois; Boston, Massachusetts; New York, New York; Bethesda, Maryland; and Atlanta, Georgia.

10.    According to witness interviews with former URS employees, DAVID ALMOG was a tax return preparer who began working for URS in or about 2001. As of at least 2006, ALMOG was the branch manager of URS's New York office located in Manhattan and a

-3-

supervisor of tax return preparers in URS's East Coast locations. During the course of the conspiracy, ALMOG reported to and communicated with URS management. ALMOG is an Israeli citizen and a United States Permanent Resident Alien. ALMOG has a United States Social Security Number and obtained a driver's license from the State of Florida.

11.    R.S. was the Vice-President of URS from in or about 2000 until in or about early 2006. R.S. worked out of the Newport Beach, California URS headquarters, located in the Central District of California.

12.    R.S. has been interviewed multiple times by the government, including interviews with agents of the Federal Bureau of Investigation, an Assistant United States Attorney, and Special Agents of the IRS-CI. R.S's interviews were conducted initially pursuant to a proffer agreement and, later, pursuant to a cooperation clause in a plea agreement with the United States Attorney's Office, Central District of California. The plea agreement provides that, based upon R.S.'s continued compliance with the terms of the plea agreement, the government will bring to the Court's attention R.S.'s cooperation at sentencing.

13.    R.S. has admitted to defrauding URS clients while employed at URS. R.S. told URS clients that they owed outstanding taxes to the federal and state government, obtained funds from the clients, and provided clients with false documentation to show that the taxes had been paid. R.S. did not, in fact, pay the clients' taxes and instead used the funds for personal purposes.

14.    R.S. has also admitted to defrauding a URS client by executing and submitting false documents to a brokerage firm in order to steal the client's funds from his Individual

Retirement Account held at the brokerage firm.

15.    R.S. has also admitted that, while employed at URS, R.S. prepared false tax returns for

URS clients in order to decrease the clients' tax liabilities. In an interview conducted in

March, 2009, R.S. stated that he stopped preparing false returns when he left URS. In a

follow-up interview, R.S. admitted that he was not truthful and that he continued to

prepare false tax returns for clients using the same methods he used at URS.

16.    On March 10, 2009, R.S. pleaded guilty to a two-count Information charging him with

wire fraud in violation of 18 U.S.C. § 1343 in the United States District Court for the

Central District of California. R.S. was sentenced to a term of 30 months' incarceration

on August 22, 2011.

17.    I reviewed a report from the National Crime Information Center concerning R.S. that was

dated September 15, 2011. He has also been convicted of the following offenses on the

following dates: (1) on August 8, 2008, R.S. was convicted of the misdemeanors of

possession of a narcotic substance and driving under the influence; (2) on October 28,

1999, R.S. was convicted of felony possession of marijuana; and (3) it appears that R.S.

also committed two parole violations in connection with this August 8, 2008 conviction

by possessing a firearm on November 17, 2009 and driving with a suspended license

under the influence on February 20, 2009. The criminal history report I received is

unclear regarding the ultimate disposition or punishment concerning these parole

violations.

## SCHEME TO DEFRAUD THE UNITED STATES

From interviews conducted with former employees, a review of URS corporate documents provided by R.S., and my review of tax returns filed with the Internal Revenue Service, I have learned the following:

18.     R.S. and others created a plan to illegally reduce clients' tax liabilities by creating false and fraudulent losses on individual and corporate returns to offset clients' profits using offshore shell entities and offshore bank accounts.

19.     The plan was executed by R.S. and ALMOG for a URS client, hereinafter referred to as Client A. The plan entailed creating a false loss for Client A that could be used to reduce Client A's income taxes. According to a witness interview with R.S., the first step in the scheme to create the false loss was for Client A to transfer money to one or more business accounts controlled by R.S., namely accounts at the Newport Office branch of Wells Fargo Bank held in the names of Platinum Planning Group, Transnet Asset Management, and/or Global Securities LLC., entities controlled by R.S. R.S. then set up a partnership between the client and Platinum Planning Group.

20.     The next step in the plan was to work with Client A to incorporate a shell company and open a bank account in the name of the shell company at the Luxembourg branch of a large Israeli bank headquartered in Tel-Aviv, Israel ("Luxembourg Bank"). The shell company established by URS had no legitimate business purpose; it was created solely for the purpose of opening a bank account at Luxembourg Bank to house client money that was hidden by the offshore transfers.

21.     In step three, Client A's funds were transferred from the R.S.-controlled business

accounts into Client A's shell company account at Luxembourg Bank. The purpose of the transfers of funds from the R.S. business bank accounts to Client A's offshore bank account was to create the appearance on paper of an investment by the Platinum/Client A partnership in Client A's shell company. There were no transfers from Client A's offshore bank account back to the Platinum/Client A partnership. On paper, it was supposed to appear as though the Platinum/Client A partnership "lost" the money transferred in a bad investment with the shell company. In reality, Client A's money was safe overseas in an account controlled by Client A.

22. The final step of the plan was to prepare a false U.S. Individual Income Tax Return that reported a false partnership flow-through loss on Client A's tax return that significantly offset Client A's reported income.

23. According to R.S.'s witness interview, Client A was a client of DAVID ALMOG's. ALMOG offered to implement the offshore structure and false-loss plan for Client A. ALMOG worked and communicated directly with R.S. at URS's headquarters in Newport Beach, California to illegally reduce Client A's taxes owed on millions of dollars of income Client A received due to the exercise of stock options. In addition to communicating with URS management in Newport Beach, California, ALMOG's role was to communicate directly with Client A with respect to executing the scheme.

24. Specifically, DAVID ALMOG, R.S., and others agreed to assist Client A to establish a foreign entity called Katumba Capital, Inc. and a bank account at Luxembourg Bank in the name of Katumba Capital, Inc. in order to carry out the offshore false-loss scheme. At all times, Client A maintained control of the funds transferred into the Katumba

-7-

Capital, Inc. bank account.

25.     According to an interview with R.S., R.S. had meetings with ALMOG and others regarding the intention to transfer funds to a foreign bank account held in the name of an offshore foreign shell company for Client A.  ALMOG provided Client A with the information regarding how to transfer his funds to Platinum Planning Group prior to the transfers offshore to the Katumba Capital, Inc. bank account.

26.     The four steps of the offshore false-loss scheme were executed for Client A as follows: (1) Client A transferred his funds to a business account held at Wells Fargo in the name of Platinum Planning Group that was controlled by R.S.; (2) Katumba Capital, Inc. and the associated Luxembourg Bank account were established with the assistance of URS employees, including ALMOG; (3) R.S. caused the transfers of Client A's funds to be made by wire from one or more of his business accounts to the Katumba Capital, Inc. bank account at Luxembourg Bank; and (4) the amounts transferred to Katumba Capital, Inc. were used by ALMOG and R.S. as a basis to report false partnership losses on Client A's 2004 U.S. Individual Income Tax Return.  That tax return reported false partnership losses in the amount of $1.8 million to offset over $3 million of taxable income Client A received through his exercise of stock options.

27.     URS received a fee in excess of $125,000 for providing this service to Client A.  Both ALMOG and R.S. received a commission based upon the fee paid by Client A.

<u>STEP ONE: CLIENT A TRANSFERS TO WELLS FARGO ACCOUNTS</u>

From my review of written documentation provided by R.S and bank records provided by Wells Fargo Bank, located in Newport Beach, California, I have learned the following:

-8-

28.     R.S. prepared a written summary of the money flowing from Client A to the accounts

R.S. controlled.  That written summary was provided by R.S. to the government during an

interview with R.S.  The summary shows that Client A transferred the money in four

increments: $567,000, $521,000, $523,000 and $557,000 for a total of $2,168,000.  The

summary also shows the amounts transferred to the Katumba Capital, Inc. and the fees

charged by URS for each group of transfers.

29.     Wells Fargo Bank provided records that corroborate R.S's written summary and show the

following:

(a) On July 22, 2004, Client A wired $521,000 from his E-Trade Securities

account at Bank of New York to an account at Wells Fargo Bank in the name of Platinum

Planning Group.

(b) On December 1, 2004, a deposit in the amount of $523,000 was made to an

account in the name of Platinum Planning Group.

(c) On December 20, 2004, Client A issued a check in the amount of $557,000

from his E-Trade Securities account at Bank of New York to an account at Wells Fargo Bank in

the name of Platinum Planning Group.

30.     A record from Wells Fargo Bank regarding the first $567,000 deposit into R.S.'s business

bank accounts could not be obtained.

<u>STEP TWO: CREATION OF THE FOREIGN ENTITY AND
ESTABLISHMENT OF THE FOREIGN BANK ACCOUNT</u>

From my review of an interview with a tax administrator at URS ("Tax Administrator A"),

described below, documents seized pursuant to a search warrant approved by United States

Magistrate Judge Charles F. Eick on March 14, 2011, and written documentation provided by R.S., I have learned the following:

31.   On March 15, 2011, a search warrant was executed at the Costa Mesa office of URS. A document entitled "Offshore Corporations" was seized pursuant to the search warrant. On page 4 of the list, the foreign corporation Katumba Capital Inc. is identified as Client A's corporation.

32.   Tax Administrator A worked for URS at URS's Newport Beach location from October, 2002, to July, 2006, and had the responsibility of preparing the documents necessary to create an offshore foreign corporation. Tax Administrator A also assisted clients with preparing the paperwork necessary to open a foreign bank account at Luxembourg Bank.

33.   Tax Administrator A identified the "Offshore Corporations" list as a list maintained to keep track of the names of the foreign corporations and the URS client that owned each foreign corporation.

34.   In or about 2006, Tax Administrator A's employment was terminated. Tax Administrator A is currently a named defendant in a civil action brought by URS against Tax Administrator A and Tax Administrator A's current employer related to a non-compete provision of Tax Administrator A's employment contract with URS. The statements made by Tax Administrator A were made pursuant to a proffer agreement.

35.   According to an interview with R.S. and documents provided to the government by R.S., ALMOG worked directly with a Luxembourg Bank representative in order to open the Luxembourg Bank account in the name of Katumba Capital, Inc.

36.   On August 8, 2004, ALMOG sent a three-page fax from the New York URS office to

-10-

R.S. in the Newport Beach, California URS office that stated: "Finally we got it". The "Re:" line of the fax reads "Katumba Inc."

37.   The second page of the fax to R.S. is a fax received by ALMOG from a Luxembourg Bank employee.  The fax is also labeled "re: Katumba" and states as follows:

> Dear David:
>
> Please note that the account is [xxx718] and the funds can be sent to us per attached forms.
>
> > Best Regards.
> >
> > [Luxembourg Bank employee]

38.   The third page of the fax ALMOG sent provides the specific wiring instruction information needed to wire money to the Katumba Inc. account held at Luxembourg Bank.

### STEP THREE: R.S. TRANSFERS THE MONEY TO LUXEMBOURG BANK

From my review of wire records from accounts at Wells Fargo Bank in Newport Beach, California that were provided by R.S., I have learned the following:

39.   In furtherance of the conspiracy, R.S. caused the following transfers of Client A's funds from Wells Fargo Bank in Newport Beach, California to the Katumba Capital, Inc. account at Luxembourg Bank:

(a)   On August 10, 2004, R.S. caused $150,000 to be wired from Wells Fargo Bank Account Number xxxxxxx738 to an account number xxx718 held in the name of Katumba Capital, Inc. at Luxembourg Bank.

(b)   On August 17, 2004, R.S. caused $400,000 to be wired from Wells Fargo Bank

Account Number xxxxxxx738 to an account number xxx718 held in the name of Katumba Capital, Inc. at Luxembourg Bank.

(c)     On October 4, 2004, R.S. caused $60,000 to be wired from Wells Fargo Bank Account Number xxxxxxx738 to an account number xxx718 held in the name of Katumba Capital, Inc. at Luxembourg Bank.

(d)     On November 17, 2004, R.S. caused $300,000 to be wired from Wells Fargo Bank Account Number xxxxxxx738 to an account number xxx718 held in the name of Katumba Capital, Inc. at Luxembourg Bank.

(e)     On December 27, 2004, R.S. caused $200,000 to be wired from Wells Fargo Bank Account Number xxxxxxx738 to an account number xxx718 held in the name of Katumba Capital, Inc. at Luxembourg Bank.

(f)     On January 12, 2005, R.S. caused $160,000 to be wired from Wells Fargo Bank Account Number xxxxxxx738 to an account number xxx718 held in the name of Katumba Capital, Inc. at Luxembourg Bank.

(g)     On January 31, 2005, R.S. caused $220,000 to be wired from Wells Fargo Bank Account Number xxxxxx448 to an account number xxx718 held in the name of Katumba Capital, Inc. at Luxembourg Bank.

(h)     On February 8, 2005, R.S. caused $220,000 to be wired from Wells Fargo Bank Account Number xxxxxx448 to an account number xxx718 held in the name of Katumba Capital, Inc. at Luxembourg Bank.

(i)     On April 14, 2005, R.S. caused $200,000 to be wired from Wells Fargo Bank Account Number xxxxxxx820 to an account number xxx718 held in the name of

-12-

Katumba Capital, Inc. at Luxembourg Bank.

40.     In total, during 2004 and 2005, approximately $1.9 million of the proceeds Client A
received from his exercise of stock options was wired to the Luxembourg Bank account
number xxx718 held in the name of Katumba Capital, Inc.

41.     The transactions were designed to create a paper trail to give the appearance of a loss
incurred by the Platinum/Client A partnership.  That false loss then flowed through to
Client A's tax return in order to fraudulently reduce the income taxes due on large gains
Client A realized from the exercise of stock options.

STEP FOUR: FALSE TAX RETURNS ARE PREPARED FOR CLIENT A

From my review of the 2004 and 2005 Individual Income Tax Returns filed by or on behalf of
Client A, the Form W-2  issued by Mercury Interactive Corp. to Client A, an interview with R.S.,
documents provided by R.S., and queries of a database accessible to the IRS,  I have learned the
following:

42.     The U.S. Individual Income Tax Returns prepared by URS and filed for Client A for tax
years 2004 and 2005 were prepared by ALMOG and R.S.  ALMOG signed Client A's
2004 tax return as the Paid Preparer, and was designated as the Paid Preparer on Client
A's electronically filed 2005 tax return.

43.     Client A was issued a Form W-2 for tax year 2004 by Mercury Interactive Corp.  The
total wages, tips, and other compensation reported in Box 1 of the Form W-2 was
$3,582,251.08.  In Box 12(c) of the Form W-2, $3,364,916.27 of the total compensation
was designated with code "V."  According to IRS publications, code "V" is used to report
income from a taxpayer's exercise of non-statutory stock options.   The Form W-2 is

-13-

attached to Client A's 2004 tax return.

44.  An amount of $3,582,251.08 was reported as income on Line 7 of Client A's tax return. Partnership losses from "Platinum/[F] Trading JV" and "PYA: Basis Carryover" totaling $1,821,612 were claimed on the tax return, which fraudulently reduced Client A's income and income taxes due and owing. The reported loss was false because Client A suffered no loss. The "loss" was created only on paper by transfers of funds through R.S.'s business accounts to Client A's Luxembourg Bank account. The money remained in an account at Luxembourg Bank in the name of Katumba Capital, Inc.

45.  The 2004 U.S. Individual Income Tax Return for Client A was filed with the IRS on or about August 9, 2005. At the time Client A's 2004 tax return was prepared, ALMOG was aware that Client A had opened a bank account at Luxembourg Bank in 2004 as demonstrated by the fax addressed to ALMOG from the Luxembourg Bank representative providing the Katumba Capital, Inc. account information. ALMOG failed to disclose the existence of Client A's Luxembourg Bank account, which ALMOG helped open, as required by U.S. law on Schedule B of Client A's 2004 income tax return. Specifically, in response to question 7(a), Client A's return reports "No" in response to whether Client A had an interest in or signatory or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account at any time in 2004.

46.  Client A's 2005 U.S. Individual Income Tax Return was filed with the IRS on or about April 17, 2006. Schedule B of Client A's 2005 income tax return is false. In response to question 7(a), Client A's return reports "No" in response to whether Client A had an

-14-

interest in or signatory or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account at any time in 2005.

47.    A query was run on a database named the Currency and Banking Retrieval System ("CBRS").  The database is used for researching tax cases, tracking money-laundering activities, investigative leads, intelligence for the tracking of currency flows, corroborating information, and probative evidence.  Based upon a search of CBRS, no FBARs were filed with the Department of Treasury by or on behalf of Client A for tax years 2004 and 2005, despite the fact that he had signature authority over a bank account at Luxembourg Bank with a balance in excess of $10,000.

48.    The use of an undisclosed account prevents the IRS from determining what, if any, taxable income in the form of interest, dividends, or capital gains, was earned on the assets in the foreign account.

49.    Based upon the foregoing, there is probable cause to believe that, from in or about May 14, 2004, to at least April 17, 2006 , DAVID ALMOG, R.S., and others unlawfully and knowingly conspired with each other, and others, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department, by deceitful and

dishonest means, in the ascertainment, computation, assessment, and collection of the

revenue, and one or more of such persons committed any act to effect the object of the

conspiracy.

_____
MIKE M. JEGALIAN
SPECIAL AGENT, IRS-CI


Subscribed and sworn before me on this
_16_ day of September, 2011, in Los Angeles, California

_____
UNITED STATES MAGISTRATE JUDGE

-16-