RICHARD G. NOVAK (SBN 149303)
Law Offices of Richard G. Novak
65 North Raymond Avenue, Suite 320
Pasadena, CA 91103
626-578-1175 (voice)
E-Mail: Richard@RGNLaw.com

Attorneys for Defendant
DAVID KALAI

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| UNITED STATES OF AMERICA, | ) | Case No. CR 11-00930(A)-TJH |
|---|---|---|
| Plaintiff, | ) | DEFENDANT DAVID KALAI'S MEMORANDUM OF POINTS AND AUTHORITIES RE. COMPETENCY; EXHIBIT |
| vs. | ) | |
| DAVID ALMOG, ET AL., | ) | Hearing Date: Nov. 4, 2013 Hearing Time: 10:00 A.M. Location: Courtroom 17 |
| Defendants. | ) | |
| | ) | Before the Honorable Terry J. Hatter, Jr., United States District Judge |

Defendant David Kalai, by and through his counsel of record, Richard G. Novak, hereby files *Defendant David Kalai's Memorandum of Points and Authorities re Competency.*

Dated:  November 1, 2013          RESPECTFULLY SUBMITTED

By: _____
Richard G. Novak,
Attorney for Defendant
DAVID KALAI

# MEMORANDUM OF POINTS AND AUTHORITIES RE. COMPETENCY

## I.

### Introduction

On October 4, 2013, undersigned counsel lodged with this Court for under seal filing a *Motion for Hearing to Determine Competency ("*the *Motion"*).   Attached to the *Motion* were a *Report of Neuropsychological Evaluation* (Exhibit "A"), prepared by Ari Kalechstein, Ph.D., and his curriculum vitae (Exhibit "B"). These documents were simultaneously served on the United States by electronic mail.  On October 9, 2013, this Court granted Mr. Kalai's application for leave to file the *Motion* under seal.  The *Motion* was noticed for hearing on November 4, 2013 at 10:00 a.m.

On October 14, 2013, the United States filed its *Response*.  In its *Response*, the United States concedes that Dr. Kalechstein's report is "sufficient evidence" to trigger the Court's obligation, under 18 U.S.C. § 4241(a), to conduct a competency hearing.  (*Response* at 1-3)  The United States does not concede that Mr. Kalai is not competent.  The *Response* states, "the government disagrees with Dr. Kalechstein's conclusions and respectfully submits that a hearing on the matter will demonstrate that D. Kalai is competent." (*Response* at 2-3)[1]

Section 4241(d) provides that the standard of proof is one of whether "[i]f, after the hearing, the court finds *by a preponderance of the evidence* that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense…" 18 U.S.C. § 4241(d) (emphasis added). "Competence is defined as the ability to understand the proceedings and to assist counsel in preparing a defense." *United*

---

[1] The United States has not sought an order compelling a further examination, nor has it asked the Court to exercise its discretion to appoint an independent expert to evaluate Mr. Kalai.

1  *States v. Dreyer*, 705 F.3d 951, 960, 961 (9th Cir. 2013) (quoting *Miles v. Stainer*,

2  108 F.3d 1109, 1112 (9th Cir.1997) (citing *Dusky v. United States*, 362 U.S.

3  402(1960) (*per curiam*))). A defendant facing trial must have "'the mental acuity to

4  see, hear and digest the evidence, and the ability to communicate with counsel in

5  helping to prepare an effective defense.'" *Hoffman v. Arave*, 455 F.3d 926, 937 (9th

6  Cir. 2006)(*quoting Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001)).

7  ## II.

8  ### The Government's Reliance on *United States v. No Runner* Is Misplaced

9  The government cites *United States v. No Runner*, 590 F.3d 962, 965 n.2 (9th

10  Cir. 2009) for the proposition that a defendant suffering from amnesia with respect

11  to the conduct charged in the indictment is not *per se* incompetent. (*Response* at 4)

12  The Ninth Circuit's holding in *No Runner* was actually that it did not have collateral

13  order jurisdiction to review the District Court's determination that No Runner was

14  competent. *Id.* at 964 ("We conclude that the collateral order doctrine does not

15  apply and that we lack jurisdiction. We therefore do not reach No Runner's

16  contention that the district court's competency determination was in error"). Aside

17  from that important clarification, the Ninth Circuit's dicta in *No Runner* is irrelevant

18  to Dr. Kalechstein's opinion because it is not his opinion that Mr. Kalai has amnesia

19  with respect to the events at issue in the indictment, the claim made by No Runner.

20  The irrelevance to *this proceeding* of the standards in *No Runner* for

21  evaluating competency in the context of an amnesic episode at the time of the

22  charged offense is best understood by reviewing the testimony of the only mental

23  health professional who evaluated No Runner's competency. It was her opinion that

24  No Runner was competent. (Exhibit "A" at 6-15) Dr. Cynthia Low testified:

25  because of the severe head trauma that she suffered at the
time of the alleged crime, it is very common for people to

26  have an amnesia around the events, and they may never
recover. But in terms of the current testing with er [sic]

27  intelligence and her memory, she actually did fairly well.

28  And that means that she's going to be able to consult and

> assist with her attorney beyond that very circumscribed
> memory loss.
> …
> when I gave her a memory test, as I said earlier, she
> scored basically in the low-average to average ranges.
> And again this is very good given her severe head injury.
> I've tested other people who have had similar head
> injuries who were doing quite worse afterwards. And Ms.
> No Runner, again, isn't showing any significant cognitive
> problems as a result.  (Exhibit "A" at 9-10)

In contrast, Dr. Kalechstein concludes that Mr. Kalai is not competent to stand trial, in part, because:

> a)   "Mr. Kalai consistently demonstrated impaired performance on the delayed recall subtests of measures of verbal learning and memory," and
>
> b)   "Mr. Kalai consistently demonstrated variable performance on measures of executive/frontal systems functioning."  (Kalechstein Report at 74-76)

With respect to his impaired ability to recall information presented to him verbally, Dr. Kalechstein explains:

> The defects in Mr. Kalai's memory manifest during the
> administration of the competency measure. On that test,
> Mr. Kalai did not consistently recollect two simple facts
> that were presented in a quiet setting on a 1:1 basis or
> newly presented information regarding the basic
> elements of the criminal justice system, i.e. roles of a
> jury, sentencing options if found guilty. If Mr. Kalai is
> unable to recollect relatively simple material that is
> presented during a neutral evaluation, then he will not be
> able to retain multiple pieces of information that might be
> presented during the course of a trial. His inability to
> recall information will severely limit his capacity to
> assist his attorney in a rational manner during the course
> of trial with respect to formulating trial strategy and
> listening to the testimony from witnesses to determine if
> there are inconsistencies or errors in that testimony.
> (Kalechstein Report at 75)

4

1      Mr. Kalai's impaired performance on measures of verbal learning and memory

2  are consistent with his medical history, his age, the results of a recent MRI of his

3  brain, and his medication regimen.  (Kalechstein Report at 75-76)  With respect to

4  Mr. Kalai's executive/frontal functioning, Dr. Kalechstein explains:

> The defects in Mr. Kalai's executive/frontal function will
> undermine Mr. Kalai's capacity to assist counsel in a
> rational manner. Specifically, frontal/executive function
> manifests as an individual's capacity to solve novel
> problems, make judgments, formulate plans, and
> strategize. During the present evaluation, Mr. Kalai
> demonstrated variable performance on measures of
> problem – solving. To the extent that Mr. Kalai
> demonstrates variable executive/frontal function, Mr.
> Kalai will struggle to make decisions as to what
> information is relevant/irrelevant, how to integrate that
> information, and how to relate to his attorney in a
> coherent, sensible manner. Such defects in cognition will
> compound and further interfere with Mr. Kalai's capacity
> to assist his attorney vis-à-vis preparation for his case and
> during the actual trial. Furthermore, to the extent that Mr.
> Kalai's defect in executive/frontal function affects his
> capacity to organize and make sense of information
> and/or to understand questions, then his defect in
> executive/frontal function will adversely affect his
> capacity to testify on his own behalf.  (Kalechstein
> Report at 76)

21      These findings were also consistent with Mr. Kalai's medical history, his

22  medication regimen and the recent MRI of his brain.  (Kalechstein Report at 75-76).

23  It is clear that the factors identified in *No Runner* are simply irrelevant to the present

24  inquiry.

25  //

26  //

27  //

28  //

5

### III.

### Commitment is "Mandatory" Only if The Court Determines That There is a "Reasonable Period of Time" "Necessary to Determine" if There is a "Substantial Probability" of Restoration

The United States argues that if this Court determines that Mr. Kalai is not competent, he must be remanded to the custody of the Attorney General. (*Response* at 5-7)  Again, the United States supports that proposition with a Ninth Circuit case that does not address the factual scenario presented in this matter.  *United States v. LKAV*, 712 F.3d 436 (9th Cir. 2013), the only case cited by the United States for the proposition that commitment is mandatory, actually held that "[w]hen the United States charges a juvenile with an act of juvenile delinquency under the Federal Juvenile Delinquency Act (the "FJDA"), 18 U.S.C. §§ 5031-42, the district court must follow 18 U.S.C. § 5037(e) [and not 18 U.S.C. § 4241(d)] if it commits the juvenile for a study of the juvenile's competency to stand trial." *Id.* at 438.

Section 4241(d)(1) provides:

> If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility—
>
> (1)  *for such a reasonable period of time*, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward… 18 U.S.C. § 4241(d) (emphasis added).

While it is true that in *LKAV* the Ninth Circuit described section 4241 as providing for a "mandatory commitment of a defendant, who has been deemed

6

1  incompetent, for study of the defendant's potential for restorability to competence," *Id.*

2  at 441, *LKAV* did not address the import of the section of the statute which provides

3  that *after* the Court has determined that a defendant is not competent, the Court must

4  determine what, if any, "period of time" is "reasonable" and "necessary" to

5  incarcerate an adult defendant for the purpose of determining "whether there is a

6  substantial probability that in the foreseeable future he will attain the capacity to

7  permit the proceeding to go forward."

8         The Ninth Circuit recently stated, "[w]e must 'give effect, if possible, to every

9  . . . word of a statute'" *Planned P1arenthood Ariz., Inc. v. Betlach*, 727 F.3d 960, 970

10 (9th Cir. 2013) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)).  "It

11 is for us to ascertain — neither to add nor to subtract, neither to delete nor to distort."

12 *Id.*at 970 (quoting *Ariz. State Bd. of Educ. for Charter Sch. v. U.S. Dep't of Educ.*, 464

13 F.3d 1003, 1007 (9th Cir. 2006)(quoting *62 Cases, More or Less, Each Containing Six*

14 *Jars of Jam v. United States,* 340 U.S. 593, 596, 71 S. Ct. 515, 95 L. Ed. 566 (1951))).

15        *LKAV* does not address the significance of the portion of section 4241(d) that

16 requires the Court to determine the period of commitment that is both "reasonable"

17 and "necessary," presumably because there was no question as to whether or not

18 restoration of his competency was foreseeable.  The Ninth Circuit opinion does not

19 make clear the basis for the findings by the tribal court and the district court that

20 LKAV was not competent, but it is clear that LKAV was in tribal custody from 2009

21 to 2011, was then transferred into federal custody pursuant to a writ of *habeas corpus,*

22 and remained in custody throughout his federal court proceedings.  *United States v.*

23 *LKAV* at 438.

24        A Ninth Circuit decision which is more relevant to the present inquiry but

25 which still does not address the significance of the Court's statutory authority to

26 determine what period of time, if any, is "reasonable" and "necessary" is *United*

27 *States v. Strong*, 489 F.3d 1055 (9th Cir. 2007).  In *Strong*, the Ninth Circuit held that

28 the "mandatory confinement" aspect of section 4241(d) does not violate the Due

1 Process Clause of the Constitution. *Id.* at 1057. The Ninth Circuit did not discuss in
2 *Strong* the significance of the portion of section 4241(d) that requires the Court to
3 determine the extent to which commitment is "reasonable" and "necessary."
4 Moreover, Strong, who was charged with crimes of violence involving weapons, was
5 detained at the time of his commitment and there is no suggestion in the opinion that
6 his competency could not be restored. *Id.* at 1057-58.[2]

7      In this proceeding, the United States has declined to seek a competency
8 evaluation by a mental health professional of its choosing, and has chosen not to ask
9 this Court to appoint an independent evaluator. The only opinion is that of Dr.
10 Kalechstein, who has concluded that Mr. Kalai's competency cannot be restored
11 because his lack of competency is due to cognitive deterioration which is
12 "degenerative" and "irreversible" and because "there exists no treatment, either
13 pharmacological or behavioral". (Kalechstein Report at 76)

14      Given Dr. Kalechstein's findings as to the causes of Mr. Kalai's incompetence
15 and its permanent nature, the lack of contrary medical opinion, Mr. Kalai's age,
16 medical condition, medication regime, and the absence of any evidence that he is a
17 danger to the community as a result of his mental condition, there is no "reasonable"
18 and "necessary" period of commitment within the meaning of section 4241(d).

19      The government's call for a commitment to the BOP, in light of its decision
20 not to seek an alternative competency evaluation, has the appearance of an effort to
21 punish Mr. Kalai for bringing to light a significant and permanent constitutional
22 impediment to this prosecution.

23
24
25
26
_____

27 [2] *Strong* also makes clear that an order committing a defendant under section 4241(d) is subject to an interlocutory appeal. *Id.* at 1058.
28

1  Dated:  November 1, 2013                    RESPECTFULLY SUBMITTED

2

3                                              By: _____

4                                                  Richard G. Novak,
                                                   Attorney for Defendant
5                                                  DAVID KALAI

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

_____

UNITED STATES OF AMERICA,

        Plaintiff,

   -vs-                      Criminal Docket
                                No. 08-88-GF-SEH
JOURNEY MARIE NO RUNNER,       Court of Appeals
                                No. 08-30449

        Defendant.

_____

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

Heard in Courtroom Number 204
Federal Courthouse
215 First Avenue North
Great Falls, Montana
November 6, 2008
1:17 p.m.


BEFORE THE HONORABLE SAM E. HADDON


UNITED STATES DISTRICT JUDGE




TINA C. BRILZ, RPR, FCRR
Official Court Reporter
United States District Court
215 First Avenue North - P.O. Box 1529
Great Falls, Montana  59403-1529



Proceedings recorded by mechanical stenography, transcript
produced by computer.

A P P E A R A N C E S :


PRESENT ON BEHALF OF THE PLAINTIFF, THE UNITED
STATES OF AMERICA:

        MR. E. VINCENT CARROLL
        Assistant U.S. Attorney
        OFFICE OF THE U.S. ATTORNEY
        119 First Avenue North, Suite 300
        P.O. Box 3447
        Great Falls, Montana  59403-3447


PRESENT ON BEHALF OF THE DEFENDANT, JOURNEY
MARIE NO RUNNER:

        MR. R. HENRY BRANOM, JUNIOR
        Assistant Federal Defender
        FEDERAL DEFENDERS OF MONTANA
        GREAT FALLS BRANCH
        P.O. Box 3547
        104 Second Street South
          Suite 301
        Great Falls, Montana  59403-3547

 1    The following proceedings were had:

 2

 3            THE COURT:  Be seated, please, all.

 4        Ms. McNeil, if you'll call this matter, please.

 5            CLERK OF COURT:  This is the time the court has set

 6    to hear a competency hearing in our Criminal Cause 08-88 of

 7    the Great Falls Division.  This is United States of America

 8    versus Journey No Runner.

 9            THE COURT:  The United States is represented in

10    this matter today by Mr. Vince Carroll of the U.S. Attorney's

11    Office.  The defendant is represented by Mr. Hank Branom.

12    The defendant is present in person.

13        This matter was originally scheduled for hearing on

14    October 21.  The purpose of the hearing:  To determine the

15    defendant's competency to stand trial.  Prior to the hearing,

16    the court had ordered an examination of the defendant.  That

17    examination was conducted as ordered.  The report of the

18    examination was provided to the court, and that report has,

19    in turn, been made available to counsel for the parties.

20        Following receipt of the report, and at the time of the

21    prior hearing, the court received a request from the

22    defendant to have Doctor Low available for examination

23    concerning the matters set forth in the report.  Some delay

24    in arranging for her availability was encountered, but she is

25    available today and is in attendance by video conferencing

1    facilities.

2          As I noted, the court has Doctor Low's report.  I am

3    going to receive that report as a part of the record for

4    consideration in connection with the issue that is before the

5    court.

6          We will, consistent with the request that has been made,

7    allow that record to be supplemented by both direct and

8    cross-examination of Doctor Low by counsel.

9          The thrust issue that is raised by the motion that is

10   before the court is grounded in, to the court's

11   understanding, a claim by the defendant that she lacks

12   recollection of the events immediately surrounding the --

13   that which took place that gives rise to the charge against

14   her.

15         And the essential assertion of the counts on behalf of

16   the defendant is that given the absence of recall of the

17   events, that it is obligatory that the court reach the

18   conclusion that this person is not competent to proceed to

19   trial.

20         I would expect that the testimony that is presented

21   today will direct itself, to the extent reasonable and

22   feasible to do so, to that particular issue; because from the

23   viewpoint of the court, that is the question that the

24   defendant has raised.  That is the question that the court is

25   going to have to address, and ultimately, to determine.

1        As counsel, I am sure, are aware, the determination that

2    I must make is whether the defendant is suffering from a

3    mental disease or defect that renders her mentally

4    incompetent to the extent that she is unable to understand

5    the nature and the consequences of the proceedings against

6    her or to properly assist in her defense.

7        That statutory definition has been further refined by

8    case law.  And in substance, the court is going to be obliged

9    to make a determination and will make a determination as to

10   whether the defendant has sufficient present ability to

11   consult with her lawyer with a reasonable degree of rational

12   understanding and has both a rational and a factual

13   understanding of the proceedings that are pending against

14   her.

15       And I will be making that determination, of course,

16   based upon what the totality of the evidence before the court

17   is once this hearing is complete.

18       Now, counsel, I have no particular preference as to

19   whether, Mr. Carroll, you proceed with some examination of

20   Doctor Low, or whether you have elected through prior --

21   prior-to-commencement-of-the-hearing consultation to proceed

22   in some other fashion, the floor is yours.

23            MR. CARROLL:  Thank you.

24       My questions for Doctor Low will be fairly brief.

25            THE COURT:  Let's have her sworn first, please.

1    Madame Clerk, if you'll administer the oath.  Doctor Low if

2    you'll take the oath, please.

3

4    CYNTHIA ANN LOW, Ph.D., having been called as a witness on

5    behalf of the United States of America, being first duly

6    sworn according to law, was examined and testified as

7    follows:

8

9              THE COURT:  You may proceed, Mr. Carroll.

10             MR. CARROLL:  Thank you, Your Honor.

11                     DIRECT EXAMINATION

12   BY MR. CARROLL:

13   Q    Good afternoon, Doctor Low.

14        Would you state your name, your full name, and spell

15   your last name, please.

16   A    Yes.  My name is Cynthia Ann Low.  L-O-W.

17   Q    Doctor Low, you're presently assigned or you work at the

18   Federal Correctional Facility at Sea-Tac, is that correct, in

19   Washington?

20   A    Yes.  It's the Federal Detention Center at Sea-Tac.

21   Q    And you conducted a forensic interview of the defendant

22   in this case, Journey Marie No Runner; is that correct?

23   A    Yes, I did.

24   Q    And based on the information in the report, I'm looking

25   at page 14, you came to a diagnosis and prognosis of the

1    defendant; is that correct?

2    A    Yes.

3    Q    One question I have:  Your prognosis for the defendant,

4    you indicated that it was guarded to neutral.  If you would

5    explain to the court what you meant by that.

6    A    Yes.  I meant it was guarded, more with regard to her

7    substance abuse diagnoses and the alcohol, the opiate use,

8    because she appeared to minimize the severity of that.

9    Q    Was there anything in your evaluation of the defendant

10   regarding her substance abuse that would affect her mental

11   competency?

12   A    No.

13   Q    When you conducted your forensic interview of the

14   defendant, did you notice any irrational behavior by the

15   defendant?

16   A    No.  None at all.

17   Q    So the defendant was polite.  She was cooperative.  She

18   made appropriate eye contact, those types of things?

19   A    Yes, she did.

20   Q    Okay.

21        Was there anything about her demeanor when you were

22   interviewing her or when you observed her to indicate that

23   she didn't understand what was going on; that she didn't

24   understand the charges against her; or that she was unable to

25   communicate with you?

1    A    No.  There were no difficulties in any of those areas

2    that you mentioned.

3    Q    Okay.

4         So she was alert, responsive, and attentive?

5    A    Yes.

6    Q    On page 11 of your report, you indicate that "the

7    defendant became tangential, but was easily redirected."

8    Would this --

9    A    Yes.

10   Q    Did this concern you in any way regarding her mental

11   competency?

12   A    No, it didn't.  Again, I noted she was just somewhat

13   tangential, meaning at times, she kind of strayed off on

14   topics; but then she was easily able to be redirected, so

15   there weren't any problems with that per se.

16   Q    Then on page 12, you indicate that the defendant

17   exhibited a relative weakness in her demonstration of

18   practical knowledge.  What did you mean by that, Doctor?

19   A    It looks as though you are referring to some results

20   from the IQ test; is that correct?

21   Q    That's correct.

22   A    Right.  That simply means that compared to her

23   performance on other sub-tests, her knowledge of just

24   practical social comprehension, that sort of thing, was just

25   a little bit weak; but that was just in comparison to her own

1    scores, not to any -- anybody else or any other clinical

2    population.

3    Q    And as the court has indicated, it's his ultimate

4    responsibility to determine competency.  But you have given

5    an opinion in this case of your thoughts on the defendant's

6    competency to stand trial.

7         With regard to her memory loss, you indicate in several

8    places in the report that her memory loss at the time of this

9    crime was normal based on the injuries that she received to

10   her -- brain injuries and other injuries she received?

11   A    Yes, that's correct.

12   Q    As far as her mental competency, how does that weigh

13   into that?  How does her memory loss weigh into your opinion

14   that she is competent to stand trial?

15   A    Well, again, because of the severe head trauma that she

16   suffered at the time of the alleged crime, it is very common

17   for people to have an amnesia around the events, and they may

18   never recover.  But in terms of the current testing with er

19   intelligence and her memory, she actually did fairly well.

20   And that means that she's going to be able to consult and

21   assist with her attorney beyond that very circumscribed

22   memory loss.

23   Q    So in your report, you indicate that she has recovered

24   well from this.  If you would explain just briefly some of

25   the things -- some of the areas that she has recovered in.

1    A    Yes.  Again, her IQ scores, all pretty much fell into

2    the low-average range.  There is not a significant decrease

3    in what we would have predicted with her IQ functioning.  And

4    again, her low tests prior to that, that can predict morbid

5    IQ functioning, and that came out to about -- let's see, to a

6    94, which is the average range.  And then when I gave her a

7    memory test, as I said earlier, she scored basically in the

8    low-average to average ranges.  And again this is very good

9    given her severe head injury.  I've tested other people who

10   have had similar head injuries who were doing quite worse

11   afterwards.  And Ms. No Runner, again, isn't showing any

12   significant cognitive problems as a result.

13   Q    Thank you, Doctor Low.

14        MR. CARROLL:  I have no further questions at this

15   time, Your Honor.

16        THE COURT:  All right.

17        You may cross-examine, Mr. Branom.

18        MR. BRANOM:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20   BY MR. BRANOM:

21   Q    Doctor Low, this is Hank Branom.  I represent Ms. No

22   Runner.

23        Can you hear me all right?

24   A    Yes, I can.

25   Q    Would you please let me know if at some point, you can't

1    hear me, please?

2    A    Yes.

3    Q    You completed your report on October 1st of this year?

4    A    Yes, I did.

5    Q    Have you done anything with regard to Ms. No Runner

6    since the report was prepared?

7    A    No.

8    Q    So your opinion contained in the report, you have the

9    same opinion as we're here today in court?

10   A    Yes.  Again, I haven't seen her since.  I don't know if

11   anything significant has happened to her in the meantime that

12   would cause any more question for her competency.

13   Q    Did you, in preparing your report, did you review any

14   medical records?

15   A    Yes.  There were voluminous medical records that were

16   sent to me.

17   Q    And I sent them to you; correct?

18   A    I believe so.

19   Q    Did you consult with a medical doctor in preparing your

20   report?

21   A    No.  But I did consult with a forensic neuropsychologist

22   in preparing my report.

23   Q    And who was that?

24   A    This would be a gentleman named Robert Denny who works

25   out of our medical center in Springfield, Missouri.

Case 2:11-cr-00930-TJH   Document 273   Filed 11/01/13   Page 21 of 29   Page ID #:2854
Case 4:08-cr-00088-SEH   Document 40   Filed 12/08/08   Page 12 of 20

12

1    Q     Was that over the phone, your consultation with him?

2    A     That was -- that was by e-mail.

3    Q     He didn't see Ms. No Runner?

4    A     No.

5    Q     Now, in your report, you indicate that Ms. No Runner's

6    credibility appeared to be sound; is that correct?  And

7    that's found on page 2.

8    A     Yes.  Yes, that's correct.

9    Q     Thank you.

10         And she related to you that she recalls nothing of the

11   accident involved in this case; correct?

12   A     Correct.

13   Q     And you didn't think she was malingering; did you?  Or

14   have an opinion that she was malingering or faking her memory

15   loss; did you?

16   A     No, I didn't.  In fact, I administered with her several

17   tests of effort to measure that, and she did just fine in

18   terms of putting forth her best effort.

19   Q     And she was in a coma for approximately a month

20   following the accident; is that correct?

21   A     That's what the medical records indicated, yes.

22   Q     And you relied on those records in preparing your

23   report; correct?

24   A     Yes.

25   Q     Now, on page 11 of your report near the top, you say

1    that a psychiatrist diagnosed her with several things.  I'm

2    going to ask you about those things in a second; but who was

3    this psychiatrist that diagnosed her with the Post-Traumatic

4    Amnesiac Disorder?

5    A    This is a contract psychiatrist who comes into our

6    facility once a week, and he sees people primarily for the

7    purpose of medication.  I also make sure that he sees all the

8    people who are referred to us for court-ordered evaluation.

9    And he typically spends 15 to 20 minutes with these folks in

10   evaluating them.

11   Q    What's the doctor's name that saw Ms. No Runner?

12   A    His name is Doctor Grant Haven.

13   Q    And were you present when he spoke with Ms. No Runner?

14   A    No, I was not.

15   Q    Is that the typical protocol that you're not present

16   when the psychiatrist --

17   A    That's correct.

18   Q    Now, as I read the record, again, I'm at the top of

19   page 11, is it Cavens, the psychiatrist?

20   A    I'm sorry.  His last name's Haven.  H-A-V-E-N.

21   Q    Thank you.

22        Doctor Haven diagnosed Ms. No Runner with Post-Traumatic

23   Amnesiac Disorder of mixed type.  What does that mean?

24   A    A post-traumatic amnesiac -- I'm sorry.  The

25   post-traumatic part comes from the accident that she was in.

1    Amnesia, of course, is the memory problems.  Retrograde

2    amnesia refers to the time period before the accident,

3    whereas anterograde amnesia refers to memory problems after

4    the accident.

5    Q    So she has both those difficulties, before and after the

6    accident?

7    A    That is what he diagnosed her with.

8    Q    Okay.

9         Do you disagree with that diagnosis?

10   A    No.  Not in general.  Again, she did have some problems

11   recalling events for, I believe, several months prior to the

12   accident, as well as a few months after the accident.

13   Q    Does she have trouble remembering the specific day of

14   the accident?

15   A    I'd have to check and see if she did or not.  I prepared

16   -- (reviewing document).

17        I believe she could only recall that it was in June of

18   2007.  I don't think she was able to recall the exact date.

19   Q    And she was unable to recall anything else about the

20   date of the accident.  Is that, at least, your recollection?

21   A    Yes.  That's correct.

22   Q    And I believe you testified in response to some

23   questions from Mr. Carroll, and I think this is also in your

24   report, that the lack of memory she's experiencing is typical

25   for someone with the brain injury she sustained; is that

 1    correct?

 2    A     Yes.

 3    Q     And in your evaluation of Ms. No Runner, is it your

 4    opinion that her lack of memory regarding the events

 5    surrounding this accident is genuine?

 6    A     Yes.  I do believe it's genuine.

 7    Q     In lay terms, you don't think she's faking it?

 8    A     No.  Not at all.

 9             MR. BRANOM:  I have nothing further.

10         Thank you, Your Honor.

11             THE COURT:  Mr. Carroll, will there be redirect?

12             MR. CARROLL:  No, Your Honor.

13             THE COURT:  Well then, Doctor Low, we thank you

14    very much for your availability this afternoon.  That

15    completes your examination; and you are excused.

16             THE WITNESS:  Thank you, Your Honor.

17             (Witness excused.  Video conference concluded.)

18             THE COURT:  Will there be additional testimony at

19    this hearing today, counsel?

20             MR. CARROLL:  No, Your Honor, not from the

21    government.

22             MR. BRANOM:  No, Your Honor.

23             THE COURT:  All right.

24         Well then, with that, we will deem the record to be

25    complete and closed on this issue.

1    And the testimony that has been presented here today is

2    helpful to bringing the issue that the court deems to be the

3    one before the court into focus.  And that question and

4    bottom line for this court to decide in its most basic form

5    is whether the failure of this defendant to have a

6    recollection of the events that give rise to the charges

7    against her renders her incompetent to go to trial.

8    And this is, of course, as noted at the outset of the

9    hearing, a matter for the court to decide.  The opinion that

10   Doctor Low has expressed in her report, which is contrary to

11   the argument made by the defense, is in the record.  The

12   report itself is in the record.

13   I have, of course, reviewed that report in detail.  It

14   is quite detailed on pages 14 and 15 in its summary of the

15   examiners', collectively, opinion on the issue of present

16   competency to stand trial.  And we have on the one hand that

17   evaluation and opinion.  And we have the argument, which is

18   based upon facts that are, essentially, not disputed; namely,

19   that there is an absence of recollection on the part of the

20   defendant.

21   We have engaged in extensive research on this issue to

22   determine if there is controlling law on this precise point

23   from the Ninth Circuit Court of Appeals.  And have not

24   determined that there is authority that would be contrary to

25   the position that the court deems necessary and appropriate

1    to take based upon, not only the circumstances of this case,

2    but decided case law from other jurisdictions, other federal

3    courts considering a comparable issue.

4        And I will reference particularly the case of United

5    States versus Stevens, which is a decision from the Seventh

6    Circuit Court of Appeals reported at 461 F.2d 317.  The

7    Seventh Circuit in its opinion references the Second Circuit

8    as being consistent with the position taken by the Seventh

9    Circuit.  And it is appropriate that I make some reference to

10   what the Seventh Circuit had to say, because in one paragraph

11   of this opinion, the position asserted by the defendant here

12   is remarkably well captured.

13       And the circuit in response to the issue that was before

14   it at the time, which is extraordinarily comparable to the

15   issue before this court, had this to say, and I quote:  "We

16   believe that the only theory by which the defendant could be

17   found on this record to have been incompetent to stand trial,

18   would be that incompetence requires no more than a present

19   inability to recall the events of one's life during the

20   period of the commission of the crime with which one is

21   charged.  Moreover, we do not believe that due process

22   requires that every defendant who claims a loss of memory go

23   free without trial."

24       The court goes on to point out that the Second Circuit

25   had concluded that a lack of memory is an inadequate ground

1    for holding a defendant incompetent to go to trial.  And then

2    the circuit -- the Seventh goes on to say this:  "If the

3    defendant had developed an amnesia or inability to recall

4    preventing recollection of the events of the day in question,

5    this would not in itself be a complete defense to the charge.

6    Such a loss of memory may call for additional safeguards, in

7    particular circumstances, but we are unwilling to hold that

8    that is -- that it is in all cases an automatic bar to

9    prosecution for a crime amply established by competent

10   evidence at trial."

11        And that, in the view of this court, is dispositive of

12   the question that is before it today.

13        This case cannot be resolved on the facts without a

14   trial.  And I have concluded from all that is said about

15   competency to stand trial, particularly the references in

16   Doctor Low's reports and the explanation that she makes, that

17   this defendant is competent to go forward to go to trial.  I

18   am satisfied that she has a sufficient present ability to

19   consult with her lawyer with a reasonable degree of rational

20   understanding, and since she has both a rational and a

21   factual understanding of the proceedings against her, then it

22   is my determination that the defendant on this record is

23   competent to go to trial, and the case will proceed to trial.

24   And the motion to dismiss charges or to determine that the

25   defendant is incompetent to proceed is denied.

1          The case will continue to trial.

2               MR. BRANOM:  I'd just like to place an objection to

3      the court's ruling on the record, Your Honor.

4               THE COURT:  Certainly.  You have that.

5               MR. BRANOM:  Thank you.

6               THE COURT:  You have that as a matter of course.

7               (The proceedings in this matter were adjourned at

8               1:43 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      C E R T I F I C A T E

 2   STATE OF MONTANA  )
                       :  SS
 3   County of Cascade )

 4

 5       I, TINA C. BRILZ, RPR, FCRR, Official Court Reporter and

 6   Notary Public of the State of Montana residing at Great

 7   Falls, Montana, do hereby certify as follows:

 8       That the foregoing motion hearing was reported by me on

 9   November 6, 2008, at 1:17 p.m. in Courtroom Number 204 in the

10   United States Courthouse in Great Falls, Montana.

11       That the foregoing nineteen (19) pages of typewritten

12   material constitute a true and accurate transcription of my

13   stenographic notes which were reduced to writing by means of

14   computer-aided transcription.

15       I further certify that I am not an attorney nor counsel

16   of any of the parties nor a relative or employee of any

17   attorney or counsel connected with this action or otherwise

18   interested in the event thereof.

19       IN WITNESS WHEREOF, I have hereunto set my hand and

20   affixed my Official Seal on this 8th day of December, 2008.

21

22               /s/ Tina C. Brilz
                 TINA C. BRILZ
23               REGISTERED PROFESSIONAL REPORTER
                 NOTARY PUBLIC for the State of
24               Montana residing at Great Falls,
                 Montana.  My commission expires
25               October 11, 2011.
```